UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN ROY GREEN,

    Plaintiff,

v.

                                          Case No. 04-71145

                                          Honorable Nancy G. Edmunds

RON DUPUIS and ADAM TARDIF,

    Defendants.
_____/

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [40]**

Plaintiff brought this Section 1983 action against the City of Hamtramck and Hamtramck Police Officers Ron Dupuis and Adam Tardif for the alleged unlawful use of excessive force in carrying out an arrest. Defendant City of Hamtramck has been dismissed by stipulation of the parties. Defendants Dupuis and Tardif have brought this Motion for Summary Judgment on grounds of qualified immunity. For the reasons discussed below, the Court DENIES Defendants' Motion for Summary Judgment.

I.    Facts[1]

In the early evening of April 21, 2002, Defendant Hamtramck Police Officers Ron Dupuis and Adam Tardif, who were investigating an attempted automobile theft, stopped a car in Hamtramck. They ordered the two occupants to exit the car. Plaintiff, who was seated in the rear seat, did as he was directed. (Pl.'s Ex. A, p. 20.)

---

[1]These facts are gleaned from portions of deposition transcripts, which the parties have selectively submitted for the Court's review.

Plaintiff exited the passenger side of the car.  He claims that he was ordered to "[m]ove to the back of the car . . . come around the back of the car and still have my hands up . . . ."  Plaintiff then walked not only to the back of the car, but all the way around to the driver's side:

> Q: You said you got out on which side of the vehicle?
> A: Passenger's side.
>
>    . . .
>
> Q: You said you then moved to the rear of the automobile?
> A: Yeah.  Around to the side with my hands up.
>
> Q: The side and the rear are two different places.  Where were you?
> A: I was at the back of the vehicle and then I somehow was at the side of the vehicle, but I wasn't back past the passenger door.
>
> Q: Were you by the rear quarter panel?
> A: Yes, sir.
>
>    . . .
>
> Q: Had you gone all the way around to the driver's side?
> A: Yes.  I hadn't made it up to the driver's door.

(Pl.'s Ex. A, p. 22.)  Plaintiff claims that he then stood still, with his hands up, exactly as the police had ordered.  (*Id.* at 23.)

Defendant Dupuis offers a slightly different account.  He states that the occupants were directed to "place their hands on the vehicle and not to move . . . .  Mr. Green did put his hands on the vehicle.  But failed to comply with the order not to move."  (Def.'s Ex. B, p. 16.)  Defendant Tardif gives yet another version of events: "[O]ne or both of the people in the car had gotten out.  I believe at this time we had ordered them down on the ground.  If I recall correctly, the driver complied.  But the rear seat passenger who had gotten out did not.  And he actually began like walking around in circles around the car."  (Def.'s Ex.

2

C, p. 23.) "[H]e continued to kind of play ring around the rosie, you know, running around the car. And he would get close to one officer and as they would kind of go he would come back around to the other officer. And he did that for a few seconds." (*Id.* at 24.)

Plaintiff claims that he did everything that he was told, but that Defendant Dupuis nevertheless walked up to him and struck him in the face. "I was stopped with my hands up listening to the orders of the police . . . . That's when the officer had his weapon drawn and then he reached out and he hit me." (Pl.'s Ex. A, p. 23.) "He holstered his gun and reached out and hit me in my eye . . . . He kind of charged up and punched me." (*Id.* at 26.) Plaintiff maintains that the officer's attack was unexpected:

> Q: Had you done anything to provoke that officer?
> A: No, sir.
>
> Q: Had you tried hitting him?
> A: No, sir.
>
> Q: Pushing?
> A: No, sir.
>
> Q: Did you call him names? Did you do anything?
> A: No, sir.

(*Id.* at 27.) Plaintiff states that he then "stumbled back because I was dazed . . . . My focus was gone when he hit me so I just gazed back." (*Id.*) "That's when the other officers grabbed on me, tried to wrestle me down but I wrestled my way out of that." Plaintiff says nothing about striking the officers, and says that he "didn't notice" if the officers struck him again. (*Id.* at 27-28.)

Defendant Dupuis states that when Plaintiff "failed to comply" with orders not to move, the officers "made a decision to take him into custody and or to detain him." (Def.'s Ex. B, p. 16.) When Dupuis "attempted to take hold" of Plaintiff, "a fight ensued," and Plaintiff

struck Dupuis "[a]bout the head and chest." (*Id.* at 17.) Dupuis admits to striking Plaintiff "[a]bout the head," though he does not recall how many times. He struck Plaintiff both with a closed and an open fist. (Pl.'s Ex. C, p. 18.) Defendant Tardif describes the encounter in much the same way. He states that when he grabbed Plaintiff's arm, Plaintiff "pulled away and started fighting . . . aggressively punching and kicking." Tardif claims that he was hit "twice in the head. Once with a fist and once with, I think with an elbow." (*Id.* at 24.)

During the struggle, Plaintiff slipped out of his coat and shirt. He then ran westbound from Hamtramck, over Interstate 75 and toward Highland Park. He claims that his purpose was to "get away from th officers that was beating me." (Pl.'s Ex. A, p. 29.)

Plaintiff describes a tense moment during the chase, in which Defendant Tardif ran into him with the patrol car:

> A: "The guy in the police car tried to run me over but when he did, I lifted myself up on the car."
>
> . . .
>
> Q: You said some officer tried to run you over with the car?
> A: Yeah, with the police car. You know how they do . . . . Well, when you see on TV, like, running guys over, you know, bump them down so they can get caught? He tried to do the same thing to me.
>
> Q: Did he actually strike you with the automobile?
> A: Yes, sir.
>
> Q: Did you fall down?
> A: No, sir.
>
> Q: What did you do?
> A: When he came, I pushed myself off the car because he was stopping as he was trying to get me. I pushed myself off and kept on running, and then I ran into the fence and jumped over the fence.

(*Id.* at 32-33.)

When Defendants next caught up with Plaintiff, another fight ensued. Plaintiff states that Dupuis caught him first, and explains what happened next:

> I was running and I was tired and I couldn't see. Same officer that hit my eye was behind me, told me to freeze, don't move . . . . [H]e's, like, put your hands up. I said I'm too tired to put my hands up. I was walking and he had his gun out and he put his gun back in his holster, then he ran and jumped on me, knocked me down on the railroad tracks and he started beating me. Beating me, I don't know, it seemed like a long time but it really wasn't a long time. Probably a few minutes. It seemed like five, six, seven minutes but probably was about three, four minutes . . . . He struck me several times. About 15 times, 16 times . . . [i]n my face and in my head."

(*Id.* at 35.) Plaintiff states that a second and third officer from Hamtramck, neither of whom Plaintiff identified, joined the fracas. These officers also hit and kicked plaintiff, particularly on his leg. (*Id.* at 36-37.) Plaintiff contends that he did nothing to warrant this type of abuse:

> Q: Did you fight with either of those officers?
> A: No, sir.
>
> Q: Did you ever strike either of those officers?
> A: No, sir.
>
> Q: Did you ever push any of the officers?
> A: No, sir.
>
> Q: Did you say anything mean to them at that time?
> A: No, sir.
>
> Q: Did you say anything at all?
> A: Yes, sir. When they was beating me, I told him that my grandmother hit harder than that.

(*Id.* at 36-37.) (Plaintiff concedes that the grandmother comment seemed to make Dupuis angry. (*Id.* at 35.))

Not surprisingly, Defendants' accounts of the second scuffle differ. Defendant Dupuis states that he drew his gun and ordered Plaintiff to the ground. When Plaintiff did not

5

comply, and instead advanced toward Dupuis and "took a boxer stance," Dupuis fought with Plaintiff. (Def.'s Ex. B, p. 20-21.) Dupuis states that Plaintiff struck him several times about the head. He admits that he returned blows "[a]bout the head and body," though he claims that he cannot recall how many times he struck Plaintiff. (*Id.* at 21.) Eventually, Dupuis was able to pull Plaintiff to the ground and handcuff him, with the help of other officers. (*Id.* at 20-21.)

Plaintiff alleges that by the time he was taken into custody, both of his eyes were swollen shut, and he was bleeding from the mouth and nose. (Pl.'s Ex. A, p. 38.) He was transported to by Defendants to the Hamtramck Police Department. Along the way, he told Defendants that he needed medical attention, to which they responded, "shut up and sit back." (*Id.* at 40.)

Plaintiff states that he remained in a jail cell for approximately five or six hours before he was transported to Detroit Receiving Hospital. (*Id.* at 46.) Doctors there noted swelling in his left eye. They diagnosed Plaintiff with a left medial wall (eye socket) fracture and a left nasal fracture. He was released with a prescription for Amoxicillin and Sudafed. (Pl.'s Ex. F.)

On June 28, 2002, Plaintiff pled *nolo contendere* in Wayne County Circuit Court to charges of attempted automobile theft and resisting or obstructing a police officer. To establish the factual basis for Plaintiff's plea, the Assistant Prosecutor read the contents of a police report into the record, including the following:

> [Plaintiff] was stopped by Officer Tardif and Officer [Dupuis] . . . . [Plaintiff] began to resist the officers by pushing them away. He struck the officers with his fist and elbows. He kicked Officer Dupuis in the knees and shin. Again, he tried to run from the officers and threw punches at the officers and then they were able to apprehend him and place him in handcuffs.

6

(Br. of Def.s' 5 (quoting Def. City of Hamtramck's Br. in Support of Mot. for Summ. J., filed Mar. 22, 2005 (Doc. 30), Ex. 2., p. 7)).)

II.   Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

III.   Discussion

Defendants' only argument for summary judgment is qualified immunity. Under *Saucier v. Katz*, 533 U.S. 194 (2001), the Court must apply a two-step inquiry. First, the Court must determine whether the alleged facts, viewed in the light most favorable to Plaintiff, demonstrate that Defendants have violated a constitutional right. *Id.* at 201. If this test is met, the Court must then determine whether the right violated was "clearly established." *Id.* Of course, as in any motion for summary judgment of a Section 1983 case alleging abuse by police officers, all facts must be viewed in the light most favorable to Plaintiff.

A. Fourth Amendment Violations

The touchstone of the first step in this analysis is whether Defendants' conduct was reasonable. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (U.S. 1989). Objective reasonableness depends on a balancing of the government's interests against the degree and nature of the intrusion into Plaintiff's constitutional rights. *Id.* at 396. The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)). The reasonableness of Defendants' force depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

8

whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)).

Under the facts of the present case—viewed, of course, in the light most favorable to Plaintiff—it is difficult to see how Defendants' actions were reasonable. Plaintiff alleges that Defendant Dupuis approached him and cold-cocked him in the face to effectuate an arrest. Plaintiff was suspected of attempting to steal a car. A serious crime, to be sure, but not so serious as to warrant this type of violent assault. Plaintiff was unarmed and standing outside of the vehicle with his hands in the air. Defendants themselves state that Plaintiff had not attempted to flee at this point, but was only playing "ring around the rosie."

Plaintiff further states that Defendant Tardif attempted to run him over or knock him down with a police car, in order to stop him from fleeing. Granted, Plaintiff had by this point wrestled his way free of officers and fled, but he was on foot and unarmed, and did not appear to present any serious risk to the public safety. Under these circumstances, running into a man with a car hardly seems reasonable as a means of arresting him. Defendants have provided no authority to the contrary, nor has the Court found any.

Plaintiff further contends that Defendant Dupuis and two other officers (presumably including Defendant Tardif) severely beat him for several minutes after they had caught up with him. He had given up running and was standing still, awaiting arrest. Under these circumstances, Defendants had no reason to strike so many blows to Plaintiff's head and body. The only provocation that Plaintiff admits is his ill-advised quip that his grandmother could hit harder than Defendants. Law enforcement professionals must have the strength to withstand such insults without responding with violence.

On balance, viewing the evidence in the light most favorable to Plaintiff, Defendants' actions were in no way reasonable. Defendants are correct that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396-397 (U.S. 1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). This Court is not confronted with a mere "push or shove," however. It is confronted with allegations of an unprovoked punch to the face, an attempted police-car-knock-down of an unarmed suspect fleeing on foot, and a prolonged gang-style beating at the conclusion of the foot pursuit. Viewing the evidence in the light most favorable to Plaintiff, Defendants have grossly violated Plaintiff's Fourth Amendment rights.

B.  Clearly Established Right

The second step in qualified immunity analysis is to determine whether the constitutional right that Defendants violated was clearly established at the time of time of the violation. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

The Court cannot understand how the above-described conduct could seem lawful to a reasonable police officer, and Defendants have presented neither evidence nor law to support such a proposition.[2] Therefore, Defendants are not entitled to qualified immunity.

---

[2]The case of against Defendant Tardiff is made somewhat more difficult by, ironically enough, Plaintiff's evidence. Plaintiff describes the police-car-knock-down as follows: "You know how they do . . . . Well, when you see on TV, like, running guys over, you know, bump them down so they can get caught? He tried to do the same thing to me." (Pl.'s Ex. A, pp. 32-33.) The Court is not aware of any such police practices, nor can the Court believe that this is considered reasonable. Perhaps during an automobile chase, officers

C. Collateral Estoppel

If Plaintiff's ultimate success in the present suit would invalidate or conflict with his previous criminal convictions, he may be collaterally estopped from pursuing a civil action. *Heck v. Humphrey*, 512 U.S. 477, 486-487 (1994). For purposes of collateral estoppel, this Court must apply Michigan law. *McAdoo v. Dallas Corp.*, 932 F.2d 522, 524 (6th Cir. 1991) (court must apply law of forum of prior decision).

The Michigan Supreme Court defines collateral estoppel as follows: "[C]ollateral estoppel applies '[when] an issue of fact or law is actually litigated and determined by a valid and final judgment . . . . A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action.'" *Lichon v. American Universal Ins. Co.*, 435 Mich. 408, 428 (Mich. 1990) (quoting 1 Restatement (Second) of Judgments § 27 & Comment e (1982)).

Under Michigan law, a "nolo contendere plea cannot be considered 'actual litigation,' at least not in terms of collateral estoppel jurisprudence. The essence of a nolo contendere plea is in its name, 'nolo contendere,' or, 'I will not contest it.' If the charges are uncontested, they are necessarily unlitigated." *Id.* at 429. Furthermore, "the procedures followed by [a] judge in establishing a factual basis for taking a nolo contendere plea" do not rise to the level of "actual litigation." *Id.* "'A plea of nolo contendere performs a specific function. As a statement of the defendant for which he may, in another proceeding or on another occasion be called upon to account, it admits nothing. It is the same as a plea of

---

are justified in ramming a suspect's *vehicle* with their own, but the justification for this maneuver—protection of the public—disappears in the context of an unarmed suspect *on foot*. The Court does not believe that a reasonable officer could find Defendant Tardif's conduct okay.

not guilty.'" *Id.* at 421 (quoting *United States v. Williams*, 642 F2d 136, 139 (5th Cir. 1981)). Thus, "neither a plea of nolo contendere nor a conviction based thereon prevents the person who entered that plea from maintaining innocence in subsequent civil litigation regardless of whether the person who entered the plea is the plaintiff or the defendant in the subsequent litigation." *Id.* at 431.

This authority makes clear that collateral estoppel does not prevent Plaintiff from recovering in this Section 1983 suit, despite the fact that he has pled nolo contendere to a charge of resisting or obstructing a police officer. *See Sigley v. Kuhn*, 2000 U.S. App. LEXIS 1465, *5-9 (6th Cir. 2000) (unpublished) (same result under Ohio law).

IV. Conclusion

At this stage of litigation, the Court must view all facts in the light most favorable to Plaintiff.[3] This neither assumes nor suggests anything about what the true facts may be, or how they may develop at trial. Defendants may be entirely innocent of all alleged wrongdoing. But for purposes of this motion for summary judgment, the Court cannot accept the police officers' evidence as true over that of the non-movant Plaintiff, where their respective versions conflict. For the reasons discussed above, there remain genuine issues of material fact in this case.

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above and on the record, the Court hereby DENIES Defendants' Motion for Summary Judgment.

---

[3]Plaintiff cites two recent Sixth Circuit cases in which the appellate court reversed district courts for engaging in inappropriate fact-finding at a preliminary stage of litigation. Both are civil rights cases similar to the present case. *Bass v. Robinson*, 167 F.3d 1041 (6th Cir. 1999); *Kostrzewa v. Troy*, 247 F.3d 633 (6th Cir. 2001).

                              s/Nancy G. Edmunds
                              Nancy G. Edmunds
                              United States District Judge

Dated: October 24, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 24, 2005, by electronic and/or ordinary mail.

                              s/Carol A. Hemeyer
                              Case Manager